GREENBERG TRAURIG, LLP
MATTHEW R. GERSHMAN (SBN 253031)
gershmanm@gtlaw.com
RYAN C. BYKERK (SBN 274534)
bykerkr@gtlaw.com
1840 Century Park East, Suite 1900
Los Angeles, CA 90067-2121
Telephone:  310-586-7700 / Facsimile:  310-586-7800

CAMERON M. NELSON (Pro Hac Vice Application to be filed)
nelsonc@gtlaw.com
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
Telephone: 312-456-8400 / Facsimile: 312-456-8435
*Attorneys for Plaintiff,*
*UL LLC*

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UL LLC,<br><br>        Plaintiff,<br><br>v.<br><br>Sturgeon Services International, Inc., a California corporation, Engineered Well Service International, Inc., a California corporation, John Powell, an individual, and John Does 1-20, individuals,<br><br>        Defendants. | CASE NO.<br><br>COMPLAINT FOR:<br>1. FEDERAL TRADEMARK INFRINGEMENT;<br>2. COUNTERFEIT OF REGISTERED MARK;<br>3. FEDERAL UNFAIR COMPETITION AND FALSE DESIGNATION OF ORIGIN AND FALSE AND MISLEADING REPRESENTATIONS;<br>4. CONTRIBUTORY TRADEMARK INFRINGEMENT; AND<br>5. UNFAIR COMPETITION UNDER CALIFORNIA BUSINESS AND PROFESSIONS CODE §§ 17200 *ET SEQ.*<br><br>JURY TRIAL DEMANDED |

Plaintiff UL LLC ("UL" or "Plaintiff") hereby alleges:

## JURISDICTION

1.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1338(a) and (b), because the claims address federal questions concerning the Lanham Act, 15 U.S.C. § 1121, trademark infringement of federally registered trademarks pursuant to 15 U.S.C. § 1114, and federal unfair competition pursuant to 15 U.S.C. § 1125(a).

2.     The Court has supplemental jurisdiction over the claims arising under the laws of the State of California, pursuant to 28 U.S.C. § 1367(a), because the state law claims are so related to the federal subject-matter claims that they form part of the same case or controversy and derive from a common nucleus of operative fact.

3.     This Court has personal jurisdiction over Defendants, because Defendants conduct business in the State of California and within this District.  Furthermore, Defendants have knowingly purchased, used in commerce, and benefited from the commercial exchange of goods bearing the infringing marks in the State of California, thus purposefully availing themselves of the privilege of conducting activities in the State of California.  Further, on information and belief, Defendants induced the sale of, knowingly purchased, used, imported, had imported, and/or distributed goods bearing counterfeit UL marks in the State of California.

4.     This Court has specific jurisdiction over the Defendants because UL's claims for trademark infringement, counterfeiting, contributory trademark infringement, and unfair competition arise from harm sustained in the State of California.  Defendants have engaged in purposeful affirmative activity directed at the State of California by, on information and belief, purchasing products for use, distribution and sale within the State of California.  Further, Defendants are causing tortious injury in the State of California by acts or omissions inside and outside of the State of California and regularly solicit business in the State of California.

5.      This Court also has general jurisdiction over the Defendants because Defendants have engaged in continuous and systematic activity within the State of California by, on information and belief, regularly purchasing and importing goods into the State of California and using and distributing them in the State of California.

## VENUE

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because, upon information and belief, a substantial part of the events or omissions giving rise to the claims occurred and are occurring in this District, and Defendants Sturgeon Services International, Inc. and Engineered Well Service International, Inc. are California corporations with their principal place of business within this District.

## THE PARTIES

7.      Plaintiff UL is a Delaware limited liability company located and doing business at 333 Pfingsten Road, Northbrook, Illinois 60062.

8.      Defendant Sturgeon Services International, Inc. ("Sturgeon") is a California corporation, entity number C0666815.  On information and belief, and based in part upon Sturgeon's documents filed with the California Secretary of State, Sturgeon has its principal place of business at 3511 Gilmore Avenue, Bakersfield, California 93308.

9.      Defendant Engineered Well Service International, Inc. ("EWS") is a California corporation, entity number C3225016. On information and belief, and based in part upon EWS's documents filed with the California Secretary of State, EWS also has its principal place of business at 3511 Gilmore Avenue, Bakersfield, California 93308, the same address as Sturgeon.  (Defendants Sturgeon and EWS are referred to collectively herein as "Corporate Defendants.")

10.     Defendant John Powell is an individual residing, on information and belief, in or around Bakersfield, California.  On information and belief, at all times relevant to this action John Powell was a California resident serving as an officer, director or managing agent of Defendant Sturgeon and was an

owner of EWS.  (The term "Defendants" as used herein shall refer to Sturgeon, EWS, and Powell, collectively.)

11.     On information and belief, John Does 1-20 are individuals and employees and/or agents of Defendants, or suppliers of the counterfeit products to Defendants, who procured, purchased, used, manufactured, imported, offered for sale, sold, and distributed the counterfeit goods addressed herein.

## NATURE OF THIS ACTION

12.     This is an action for trademark infringement, counterfeiting, contributory trademark infringement, unfair competition under the Federal Trademark Act of 1946, known as the Lanham Act, 15 U.S.C. § 1051, et seq., and violation of California Business and Professions Code section 17200 *et seq.*

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A.     UL'S VALUABLE RIGHTS

13.     Founded in 1894, UL, including its affiliates and predecessors, is one of the oldest certification companies in the United States.  UL has tested, inspected, and certified products as well as developed safety standards for over a century.

14.     UL's services include promulgating safety standards, certifying that representative samples of products satisfy applicable safety standards, and providing follow-up testing and inspection services to confirm that manufacturers are in compliance.

15.     UL is a global independent safety science company offering certification, validation, testing, inspection, advising, training, and auditing services for a variety of industries around the globe.

16.     UL owns the well-known UL-in-a-circle certification mark ⓊⓁ and variations thereof (the "UL Certification Marks").  UL also owns the service mark UL (the "UL Service Mark").

17.     UL has been providing testing reports and certifying products that conform to UL's Standards for Safety since at least 1906.  Since at least 1906, UL, including its affiliates and

predecessors, have continuously used the UL Service Mark in interstate commerce.

18.   UL has been testing products and authorizing use of the well-known UL Certification Marks on products that conform to UL's Standards for Safety in interstate commerce in the United States since at least 1937.  UL's authorized customers have been using the UL Certification Marks on products offered for sale and distributed in interstate commerce since 1937.

19.   UL serves all members of the general public, including, but not limited to, consumers, manufacturers, suppliers, retailers, vendors, trade groups, industry associations, regulatory bodies, and governmental entities.

20.   UL's thousands of authorized customers have used UL's well-known UL Certification Marks on billions of household, consumer, commercial, and industrial products including refrigeration equipment, lighting products, cable, wiring, building materials, life safety vests, batteries and power packs for computers and consumer electronics, traffic signals, sprinklers, cash registers, and many more.

21.   Over the past century, UL has promoted recognition of its certification programs through a wide variety of marketing channels on a national, regional, and local basis, including but not limited to television, radio, consumer and trade newspapers, consumer and trade magazines, industry trade journals, promotional literature, brochures, direct mail, email campaigns, its interactive website located at <ul.com>, and the UL Safety at Home page located on <facebook.com>.  UL also promotes its UL Certification Mark and Service Mark through its participation in standards development activities, follow-up conformity assessment and inspection services, community involvement, and safety science research.

22.   As a result of UL's extensive use of the UL Service Mark to promote its certification programs, including standards development activities, follow-up conformity assessment and inspection services, community involvement, and safety science research, the UL Service Mark and UL Certification Marks have attained a national and global reputation for technical expertise and integrity, and have become a symbol of trust and objectivity.

23.     The UL Service Mark and the UL Certification Marks are well-known and recognized by the general public as well as members of local, state and federal government regulatory bodies and industry trade associations, as marks indicating testing, inspection, validation, certification, training, advising, and auditing services originating with UL.

24.     The UL Service Mark and the UL Certification Marks are renowned among the general public as symbols of UL's testing, inspection and certification services originating with UL, and have been renowned since long before Defendants began engaging in the conduct alleged in this Complaint.

25.     UL has duly and properly registered the UL Service Mark and the UL Certification Marks in the United States Patent and Trademark Office ("USPTO") on the Principal Register.   UL owns the following federally registered marks. Copies of these registrations, or their corresponding USPTO website pages, are attached as Exhibits A through C.

| MARK | REG. NO. | EXHIBIT | TYPE |
|------|----------|---------|------|
| (UL logo) | 0782589 | A | Certification Mark |
| (UL logo) | 2391140 | B | Certification Mark |
| UL | 4201014 | C | Service Mark |

26.     The federal trademark registrations referenced above are valid and subsisting, and provide conclusive evidence of the right of UL to use the UL Service Mark and authorize the use of the UL Certification Marks in commerce.

27.     UL certifies the products of others in a variety of industries (the "Certification Services") under its UL Certification Marks (Exhibits A-B), and offers educational, business advisory, product safety testing, and public safety services (the "UL Services") under its UL Service Mark.

28.     Use and registration of the UL Certification Marks and the UL Service Mark clearly establish that UL has senior trademark rights in its family of UL Certification Marks and UL Service Mark, and consequently there is no question of priority of rights, as such priority clearly belongs to UL.

29.     UL's United States Trademark Registration Nos. 2391140 and 782589 referenced above are incontestable under 15 U.S.C. § 1115(b).   As such, UL's incontestable federal trademark registrations confer exclusive use of the UL Certification Marks throughout the United States in connection with the UL Certification Services.

30.     UL has extensively used the UL Service Mark and has advertised, promoted, and offered the UL Services under the UL Service Mark in interstate commerce through various channels of trade. As a result, the customers and potential customers of UL, and the public in general have come to know and recognize the UL Service Mark as identifying the UL Services as services of the highest quality offered by UL, and associate the UL Service Mark with the UL Services.  UL has thus built up extensive and invaluable goodwill in connection with the sale of its services offered under its UL Service Mark.

**B.      THE IMPORTANCE OF CERTIFYING FLAME-RESISTANT GARMENTS**

31.     Flame-resistant garments are an important component of industrial workplace safety.  A worker who is subject to a flash fire while wearing non-compliant clothing can actually experience *more severe* injuries than if he or she had not been clothed at all.  For example, a worker's clothing might melt or stick to the burned skin, or it might continue to burn itself thereby adding to the original injury.

32.     Flame-resistant clothing is designed to (a) reduce the severity of burn injuries a worker may suffer in a flash fire, and (b) provide a minimum degree of protection to the wearer from the flash fire.  Standards for flame-resistant garments are governed by the National Fire Protection Agency's NFPA 2112: Standard on Flame-Resistant Garments for Protection of Industrial Personnel Against Flash Fire.[1]

---

[1] The Court can access NFPA § 2112 at http://www.nfpa.org/codes-and-standards/document-information-pages?mode=code&code=2112, after creating a free account with NFPA.

33.     Flame-resistant garments are typically used by industrial personnel in the petroleum and chemical industry.  An employer who fails to provide flame-resistant garments to its employees may be in violation of OSHA regulations.[2]

34.     UL tests flame-resistant garments to confirm compliance with NFPA 2112 and then certifies them.  Some of the tests required by NFPA 2112 to be carried out on the representative sample garments include a full-mannequin flame test, which measures whether the garment protects the user or contributes to the user's injuries, and other lab tests designed to determine whether the garment will inhibit combustion and heat transfer.  NFPA 2112 requires that garments bear a third party certification mark (such as UL's certification mark), along with other labeling requirements, to confirm and represent to the public that the garments have been manufactured in compliance with the NFPA 2112 Standard.  The appearance of a UL Certification Mark on these garments is the manufacturer's representation that the garment meets the requirements of NFPA 2112 and that UL has performed the applicable compliance testing and issued a certification.

35.     The use of the UL Certification Mark on the product is the only method provided by UL to identify products under this certification program.  The required markings for these products should include the following: (i) UL Certification Mark; (ii) the word "CLASSIFIED" above the UL Certification Mark; (iii) the UL control number; and (iv) the following additional information: "**PROTECTIVE CLOTHING FOR PROTECTION OF INDUSTRIAL PERSONNEL AGAINST FLASH FIRE IN ACCORDANCE WITH NFPA 2112-[issue date] [Control No.]**"

**C.      ZIMPEX INC.'S INFRINGEMENT OF UL'S MARK**

36.     Notwithstanding UL's exclusive rights in and to the UL Certification Marks and the UL Service Mark, and well after UL's adoption and registration of the UL Certification Marks and the UL Service Mark, Zimpex Inc. and/or Rebecca Zhu aka Rebecca Rynders, who is, on information and

---

[2] *See* https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=INTERPRETATIONS&p_id=27296 ("CSHOs shall cite 29 CFR 1910.132(c) where the employer fails to provide FRC that is of safe design and construction for work being performed. Employers may consult consensus standards such as NFPA 2112 and 2113 to comply.").

belief, Zimpex's sole shareholder (collectively "Zimpex") and was, at all relevant times, the girlfriend of the Chief Executive Officer of Sturgeon, Defendant John Powell, adopted and began using a mark that is identical or substantially indistinguishable from the UL Certification Marks (the "Counterfeit Mark") to suggest falsely that Zimpex's goods had been tested and certified by UL. Specifically, Zimpex was using a Counterfeit Mark on alleged flame-resistant garments, when in fact those garments have never been tested or otherwise certified as flame-resistant by UL.

37. Zimpex sold the garments bearing a Counterfeit Mark to Defendants Sturgeon and EWS, which employ industrial workers that need protection from flash fires. Zimpex, along with Defendants, arranged for the importation of these garments from China, as well as the sale of the garments bearing a Counterfeit Mark to Defendants.

38. On information and belief, Defendants, in conjunction with Zimpex, directed the purchase, importation, offer for sale, sale, use, and distribution of the garments bearing a Counterfeit Mark, with full knowledge by Defendants that Zimpex was having made, importing, and selling garments bearing a Counterfeit Mark.

39. The Counterfeit Mark on Zimpex's products was identical to and confusingly similar to the UL Certification Marks in appearance, sound, meaning, and commercial impression.

40. Zimpex's goods bearing a Counterfeit Mark falsely suggested that the Zimpex's goods had been tested and certified by UL.

41. Zimpex's use of a Counterfeit Mark traded off the goodwill of the UL Service Mark and the UL Certification Marks and was without permission or license from UL.

42. Zimpex advertised and sold its goods in commerce using a Counterfeit Mark.

43. Zimpex's goods bearing a Counterfeit Mark were not tested and certified by UL to any safety requirements, and as such, may place the health and safety of the user at risk.

44. On information and belief, Zimpex was engaged in a regular business of selling products bearing a Counterfeit Mark.

45.     Upon information and belief, Zimpex used a Counterfeit Mark without the authorization of UL, thereby confusing consumers as to the certification of the goods by UL and resulting in damage and detriment to UL and its reputation and goodwill.

46.     Upon information and belief, Zimpex knew or had reason to know of the UL Certification Marks and the UL Service Mark at the time Defendants commenced use of their Counterfeit Mark. Zimpex was on constructive notice of the UL Certification Marks and the UL Service Mark by virtue of their federal registration.

47.     Upon information and belief, Zimpex intentionally adopted and use the Counterfeit Mark so as to create consumer confusion and traffic off of UL's reputation and goodwill under the UL Certification Marks and UL Service Mark.

**D.     UL'S ACTION AGAINST ZIMPEX AND ZHU**

48.     On May 7, 2015, UL filed suit against Zimpex and Rebecca Zhu in the United States District Court for the Eastern District of California, in an action entitled *UL LLC v. Rebecca Rynders aka Rebecca Zhu, and Zimpex Inc.*, Case No. 1:15-CV-00703-TLN-SAB ("the Zimpex Action"). The same day, UL filed an Ex Parte Application for a Temporary Restraining Order enjoining Zimpex and Zhu's further use and sale of the goods bearing the Counterfeit Mark.

49.     The Court granted UL's application on May 8, 2015 and entered a temporary restraining order on May 11, 2015 enjoining Zimpex and Zhu's further use and sale of the goods bearing the Counterfeit Mark.

50.     On June 1, 2015, the court in the Zimpex Action entered a preliminary injunction pursuant to the parties' stipulation, which, among other things, enjoined Zimpex and Zhu's further use and sale of the goods bearing the Counterfeit Mark.

51.     On April 20, 2016, Zimpex, Inc. filed a voluntary petition for relief pursuant to Chapter 7 of Title 11 of the United State Code in the United States Bankruptcy Court for the Eastern District of California, resulting in the opening of bankruptcy case number 16-11362-A-7. Pursuant to 11

U.S.C. § 362, the Zimpex Action was stayed.  The Zimpex Action remains stayed at this time.

**E.      DEFENDANTS' DIRECT AND CONTRIBUTORY INFRINGEMENT**

52.      The Corporate Defendants are oilfield service contractors that each employ numerous workers in the petroleum industry.  On information and belief, the Corporate Defendants share common management, common ownership, constitute a joint venture, and/or act or hold themselves out as agents of one another.  Defendant John Powell was, at all times relevant to this action, an employee of Sturgeon serving as Sturgeon's Chief Executive Officer.  Upon information and belief, Defendant John Powell was also an owner of EWS.

53.      As oilfield service contractors, nearly all of the Corporate Defendants' employees work in or around oilfields, typically on premises owned by the Corporate Defendants' customers.  For the protection of their employees, Defendants are under a legal duty to provide OSHA-compliant flame-resistant that is of safe design and construction for the work being performed.  Defendants' compliance with applicable law is enforced by regulators, who may identify compliant flame-resistant clothing in part by the tags affixed to the clothing.

54.      In addition, the Corporate Defendants' customers are under a legal duty to ensure minimum safety standards are met, and these customers require that employees of the Corporate Defendants working on their premises meet legal safety requirements and the customers' own internal safety requirements, including that the employees don OSHA-compliant flame-resistant clothing.  Customers may identify compliant flame-resistant clothing in part by the tags affixed to the clothing.

55.      In addition, employees of the Corporate Defendants, for their own physical safety, are entitled to know whether the garments provided by Defendants are effective and compliant flame-resistant clothing.  Employees of the Corporate Defendants may identify compliant flame-resistant clothing in part by the tags affixed to the clothing.

56.      The customers and employees of the Corporate Defendants reasonably rely on Defendants to fulfill their legal obligations and provide employees with OSHA-compliant flame-

resistant clothing.  The regulators, customers, and employees of the Corporate Defendants reasonably rely on the tags affixed to the clothing to determine whether the clothing provided by Defendants meets minimum safety standards.

57.     Notwithstanding the Defendants' duties to provide OSHA-compliant flame-resistant clothing to employees of the Corporate Defendants, and notwithstanding Defendants' knowledge or constructive knowledge of the significance of the UL Certification Marks and UL Service Mark and the Certification Services provided by UL, and notwithstanding UL's exclusive rights in and to the UL Certification Marks and the UL Service Mark, and well after UL's adoption and registration of the UL Certification Marks and the UL Service Mark, Defendants conspired with Zimpex to procure, import, offer for sale, sell, use and distribute garments bearing a Counterfeit Mark on alleged flame-resistant garments, when in fact those garments have never been tested or otherwise certified as flame-resistant by UL.

58.     Specifically, upon information and belief, Defendant John Powell, acting as Chief Executive Officer of Sturgeon and, on information and belief, an owner of EWS, caused Sturgeon to discontinue its contract with a reputable supplier of flame-resistant garments and directed Sturgeon to instead purchase replacement garments for Sturgeon and EWS employees from Zimpex, Inc., a company owned by Powell's girlfriend, at below-market prices.  Upon information and belief, Powell's decision to source Sturgeon and EWS's flame-resistant garments through Zimpex was made with the intent or the reasonable anticipation that Zimpex would provide the Defendants with goods that have not been certified by UL, yet bear a label with a Counterfeit Mark identical to or substantially indistinguishable from UL's Mark.

59.     Upon information and belief, based on his personal knowledge of Zimpex, Inc. and his personal relationship with Rebecca Zhu, Defendant John Powell knew or should have known that the Zimpex garments, which were sourced from a manufacturer in China and purchased by Defendants at significantly below-market prices, had not been tested by UL or by anyone to determine whether they

were NFPA 2112 compliant, even though the garments bore a mark identical to or substantially indistinguishable from the UL Certification Marks. On information and belief, from Defendants' first purchase of the goods bearing the Counterfeit Mark, it was widely known by Defendants and numerous employees of the Corporate Defendants that the garments bore a Counterfeit Mark.

60. Upon further information and belief, after Defendants began using the Zimpex garments and distributing them to the employees of the Corporate Defendants, an employee of Sturgeon, concerned that the garments were not UL certified, even though they bore the UL mark, sent the Zimpex garments to an independent garment company for testing. After the independent garment company conducted its tests, it prepared a written report that was delivered to Chief Executive Officer John Powell, Chief Operating Officer Chris Rodman, and Safety Manager Jackie Bowers. The written report stated that the Zimpex garments were not NFPA 2112 or 2113 compliant, and that after an extensive online search and a phone call with UL, the independent garment company discovered neither the garment manufacturer nor Zimpex, Inc. were UL certified, indisputably confirming that the mark displayed on the garments was not genuine. On information and belief, Defendant John Powell and the other recipients of the written report read and understood the report, and its significance.

61. Upon information and belief, even after the Defendants received the independent garment manufacturer's report stating that the Zimpex garments bore the Counterfeit Mark, Defendants continued to procure, purchase, use and distribute the garments bearing the counterfeit and infringing label from Zimpex for use by employees of both of the Corporate Defendants.

62. Upon information and belief, Defendants intentionally induced Zimpex's trademark infringement and/or knowingly participating in furthering Zimpex's scheme of trademark infringement by continuing to procure, purchase, import, offer for sale, sell, use, and distribute the garments bearing a Counterfeit Mark even after having actual knowledge of Zimpex's infringing conduct.

63. Defendants' scheme to have Zimpex provide the Defendants with goods bearing the Counterfeit Mark at below-market prices was intended to and did benefit Zimpex and Defendants.

64.    Throughout Defendants' relationship with Zimpex, Defendants, in conjunction with Zimpex, arranged for the procurement, purchase, importation, offer for sale, sale and distribution of the garments bearing a Counterfeit Mark, with full knowledge by Defendants and Zimpex that the garments bore a Counterfeit Mark.

65.    Defendants' use of the Counterfeit Mark is identical to and confusingly similar to the UL Certification Marks in appearance, sound, meaning, and commercial impression.

66.    Defendants' procurement, purchase, and distribution of garments bearing a Counterfeit Mark falsely suggest to the Defendants' regulators, employees and customers that the goods have been tested and certified by UL.

67.    Defendants' procurement, purchase, and distribution of garments bearing a Counterfeit Mark trades off the goodwill of the UL Service Mark and the UL Certification Marks and is without permission or license from UL.

68.    Defendants, in arranging for the procurement, purchase, and distribution of the garments bearing a Counterfeit Mark have used such goods in commerce in connection with the distribution of goods.

69.    The goods bearing the Counterfeit Mark have not been tested and certified by UL to any safety requirements, and as such, may place the health and safety of the user at risk.

70.    On information and belief, Defendants are engaged in the regular business of procuring, purchasing, importing, and distributing garments bearing a Counterfeit Mark.

71.    Upon information and belief, Defendants use and intend to continue using a Counterfeit Mark without the authorization of UL, thereby confusing consumers as to the certification of the goods by UL and resulting in damage and detriment to UL and its reputation and goodwill.

72.    Upon information and belief, Defendants knew or had reason to know of the UL Certification Marks and the UL Service Mark at the time Defendants commenced use of the Counterfeit Mark.  Defendants were on constructive notice of the UL Certification Marks and the UL Service Mark

by virtue of their federal registration.

73.     Upon information and belief, Defendants intentionally adopted and use the Counterfeit Mark so as to create consumer confusion and traffic off of UL's reputation and goodwill under the UL Certification Marks and UL Service Mark.

74.     In addition and/or in the alternative, upon information and belief, Defendants knowingly cooperated in Zimpex's illegal and tortious infringing and counterfeiting activity by knowingly inducing Zimpex to infringe UL's federally registered trademarks, and/or for knowingly participating in Zimpex's scheme of trademark infringement.

## COUNT ONE

## (Federal Trademark Infringement – 15 U.S.C. § 1114)

75.     UL repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

76.     Defendants' Counterfeit Mark is identical to or substantially indistinguishable from the UL Certification Marks and UL Service Mark in appearance, sound, meaning, and commercial impression, such that the use and registration thereof is likely to cause confusion, mistake, and deception as to the certification of Defendants' goods, and that the public is likely to be confused, deceived, and to assume erroneously that Defendants' goods have been certified by UL or that Defendants are in some way connected with, licensed, authorized, certified by, or affiliated with UL, and will irreparably injure and damage UL and the goodwill and reputation symbolized by the UL Certification Marks and the UL Service Mark.

77.     As the Counterfeit Mark used on Defendants' goods is identical to or substantially indistinguishable from the UL Certification Marks and UL Service Mark, the public is likely to be confused and deceived, and to assume erroneously that Defendants' goods have been certified by UL or that Defendants are in some way connected with, licensed, sponsored by, or affiliated with UL, all to UL's irreparable damage.

78.     Likelihood of confusion is enhanced by the fact that the UL Certification Marks and the UL Service Mark are strong, well-known, and entitled to a broad scope of protection.

79.     Likelihood of confusion is also enhanced by the fact that the Counterfeit Mark, the UL Certification Marks and the UL Service Mark prominently incorporate the key component "UL."

80.     Defendants are not affiliated or connected with UL and have not been endorsed or sponsored by UL, nor has UL tested or certified any of Defendants' goods offered or sold or intended to be sold by Defendants bearing the Counterfeit Mark.

81.     Defendants have never sought or obtained the permission of UL to use the Counterfeit Mark, nor has UL certified any of Defendants' goods bearing the Counterfeit Mark.

82.     UL's United States Trademark Registrations set out above provide, at the very least, constructive notice to Defendants of the rights of UL in and to the UL Certification Marks and the UL Service Mark.

83.     Defendants' use of the Counterfeit Mark in connection with the Defendants' goods is likely to cause confusion, mistake, or deception of consumers as to the authorization or certification of the goods, in violation of the Lanham Act, including but not limited to 15 U.S.C. § 1114.

84.     Consumers are likely to purchase, use, or engage Defendants' goods being offered under the Counterfeit Mark believing them to have been certified by UL, thereby resulting in a loss of goodwill and economic harm to UL.

85.     Upon information and belief, Defendants intentionally adopted and used the Counterfeit Mark so as to create consumer confusion and traffic off of UL's reputation and goodwill under the UL Certification Marks and the UL Service Mark.  Defendants have recklessly placed garments into the marketplace which purport to have been tested by UL under appropriate safety standards, when in fact UL never performed any such testing on the garments Defendants are selling.

86.     UL is informed and believes and on that basis alleges that Defendants have derived unlawful gains and profits from their infringing use of the Counterfeit Mark.

87.     The goodwill of UL's business under the UL Service Mark is of great value, and UL will suffer irreparable harm should Defendants' infringement be allowed to continue to the detriment of the trade reputation and goodwill of UL for which damage UL cannot be adequately compensated at law.

88.     UL has no control over the whether the goods offered by Defendants meet NFPA 2112, and Defendants have not submitted their goods for testing.  Thus, the great value of the UL Certification Marks and the UL Service Mark is subject to damage by an entity it cannot control.

89.     Unless Defendants are enjoined by this Court from so doing, UL will continue to suffer irreparable harm and injury to its goodwill and reputation.

90.     Upon information and belief, Defendants have engaged in acts of infringement, with knowledge of UL's exclusive rights in and to the UL Certification Marks and the UL Service Mark in connection with the UL Services, and Defendants continue in such acts of intentional infringement, thus entitling UL to an award of treble damages, disgorgement of Defendants' unlawful gains and profits, and attorneys' fees and costs in bringing and maintaining this action, pursuant to Section 35(b) of the Lanham Act, 15 U.S.C. § 1117(b).

**COUNT TWO**

**(Counterfeit of Registered Mark – 15 U.S.C. § 1114)**

91.     UL repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

92.     UL owns valid and incontestable United States Trademark Registrations for its UL Certification Marks, as set out above.

93.     Well before any of Defendants' actions complained of herein were committed, UL had continuously used the UL Certification Marks throughout the United States in connection with its Certification Services.

94.     Defendants use a non-genuine version of the UL Certification Marks and UL Service Mark that is identical to, or substantially indistinguishable from, the UL Certification Marks and UL

Service Mark.

95.     The UL Certification Marks are registered on the Principal Register as a certification mark, and Defendants are intentionally using the Counterfeit Mark to falsely suggest that Defendants' goods have been certified by UL.

96.     UL did not authorize Defendants' use of the Counterfeit Mark, and such unauthorized use of the UL Certification Marks and UL Service Mark is likely to confuse consumers into falsely believing that Defendants' goods are certified by UL when, in fact, they are not.

97.     Defendants' use of the Counterfeit Mark without consent from UL was and is a willful and intentional infringement of UL's registered UL Certification Marks and UL Service Mark.

98.     Defendants have profited from their acts of infringement.  UL is entitled to recover Defendants' unlawful gains and profits arising from the infringement, any damages sustained by UL arising from said infringement, as well as the costs of this action.  UL also is entitled to an enhanced award of profits and/or damages to fully and adequately compensate it for Defendants' infringement.  At its election, UL also is entitled to statutory damages.

99.     Defendants have caused and, unless enjoined by this Court, will continue to cause irreparable injury to UL that is not fully compensable in monetary damages.  UL is therefore entitled to a preliminary and permanent injunction enjoining and restraining Defendants from use of the UL Certification Marks and UL Service Mark or any other mark that is confusingly similar to the UL Certification Marks and the UL Service Mark.

## COUNT THREE

### (Federal Unfair Competition and False Designation of Origin and

### False and Misleading Representations – 15 U.S.C. § 1125(a))

100.     UL repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

101.     Defendants' use of the Counterfeit Mark constitutes unfair competition and a false

designation of origin or false or misleading description or representation of fact, which is likely to deceive, among others, regulators, customers, and employees of Defendants into believing that Defendants' goods offered for sale under Defendants' Counterfeit Mark have been certified by UL, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

102.    Defendants' actions cause or are likely to cause confusion or mistake among the public as to the testing and certification of Defendants' goods offered for sale bearing Defendants' Counterfeit Mark, or to confuse the public into believing that Defendants' goods are otherwise affiliated, connected, associated with, or sponsored by UL, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

103.    UL has no control over the nature and quality of Defendants' goods offered for sale bearing Defendants' Counterfeit Mark.  Any failure, neglect, or default of Defendants in providing goods will reflect adversely on UL.

104.    Upon information and belief, Defendants intentionally adopted and used the Counterfeit Mark so as to create consumer confusion and traffic off of UL's reputation and goodwill under the UL Certification Marks and the UL Service Mark.

105.    UL is informed and believes and on that basis alleges that Defendants have derived unlawful gains and profits from its infringement of the UL Certification Marks and the UL Service Mark.

106.    The goodwill of UL's business under the UL Service Mark is of great value, and UL will suffer irreparable harm to its trade reputation and goodwill, should Defendants' acts of unfair competition and false representation and designations be allowed to continue.

107.    UL has no control over the quality of the goods offered by Defendants.  Thus, the value of the UL Certification Marks and the UL Service Mark is subject to damage by entities and individuals it cannot control.  Unless enjoined by this Court from so doing, Defendants will continue to engage in acts of unfair competition, false representation and designation, to the irreparable damage and injury of

UL.

108.    Upon information and belief, from the outset, Defendants have engaged in acts of unfair competition, false representation and designation, with knowledge of the exclusive rights of UL in and to the UL Certification Marks and the UL Service Mark, and Defendants continue in such acts of unfair competition and intentional false representation and designation, thus entitling UL to an award of its actual damages, disgorgement of Defendants' unlawful gains and profits, and attorneys' fees and costs in bringing and maintaining this action, pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a).

## COUNT FOUR

### (Contributory Trademark Infringement)

109.    UL repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

110.    The above-described conduct of Zimpex, including, among other things, knowingly adopting and using the Counterfeit Mark, selling garments bearing the Counterfeit Mark to the Defendants, and importing, offering for sale, using and distributing garments bearing the Counterfeit Mark, amount to direct trademark infringement of UL's federally registered trademarks pursuant to 15 U.S.C. § 1114.

111.    In addition to Defendants' own direct infringement of UL's federally registered trademarks pursuant to 15 U.S.C. § 1114, described above, Defendants are also liable for contributory infringement, for inducing Zimpex to infringe UL's federally registered trademarks, and/or for knowingly participating in Zimpex's scheme of trademark infringement.

112.    Specifically, as alleged above, Defendant John Powell, acting as Chief Executive Officer of Sturgeon and, on information and belief, an owner of EWS, caused Sturgeon to discontinue its contract with a reputable supplier of flame-resistant garments and directed Sturgeon to purchase replacement garments for use by Sturgeon and EWS employees from Zimpex, Inc., a company owned

by Defendant John Powell's girlfriend.  Upon information and belief, Defendant John Powell's decision to source Sturgeon and EWS's flame-resistant garments through Zimpex was made, with full knowledge of the Corporate Defendants, with the intent that Zimpex would provide the Defendants with garments bearing the Counterfeit Mark at below-market prices, to the benefit of Zimpex and Defendants, without regard for NFPA 2112 compliance.  Upon information and belief, based on John Powell's personal knowledge of Zimpex and his relationship with Rebecca Zhu, and the report from the independent garment manufacturer, Defendants and each of them knew or should have known that the Zimpex garments, which were sourced from a manufacturer in China and purchased at significantly below-market prices, had not been tested by UL or by anyone to determine whether they were NFPA 2112 compliant, even though the garments bore a mark identical to or substantially indistinguishable from the UL Certification Marks.

113.    Upon information and belief, Defendants intentionally induced Zimpex's trademark infringement and/or knowingly participating in furthering Zimpex's scheme of trademark infringement by continuing to procure, purchase, import, offer for sale, sell, use, and distribute the garments bearing a Counterfeit Mark even after having been put on notice of Zimpex's infringing conduct.

114.    UL is informed and believes and on that basis alleges that Defendants have derived unlawful gains and profits from the contributory infringement of UL's registered mark.

115.    The goodwill of UL's business under the UL Service Mark is of great value, and UL will suffer irreparable harm should Defendants' contributory infringement be allowed to continue to the detriment of the trade reputation and goodwill of UL for which damage UL cannot be adequately compensated at law.

116.    UL has no control over the whether the goods offered by Zimpex and used by Defendants meet NFPA 2112, and Defendants have not submitted their goods for testing.  Thus, the great value of the UL Certification Marks and the UL Service Mark is subject to damage by an entity it cannot control.

117.    Unless Defendants are enjoined by this Court from so doing, UL will continue to suffer

irreparable harm and injury to its goodwill and reputation.

118.    Upon information and belief, Defendants have engaged in acts of contributory infringement, with knowledge of UL's exclusive rights in and to the UL Certification Marks and the UL Service Mark in connection with the UL Services, and Defendants continue in such acts of intentional contributory infringement, thus entitling UL to an award of treble damages, disgorgement of Defendants' unlawful gains and profits, and attorneys' fees and costs in bringing and maintaining this action, pursuant to Section 35(b) of the Lanham Act, 15 U.S.C. § 1114.

## COUNT FIVE

## (Unfair Competition under California Business and

## Professions Code §§ 17200 *et seq.*)

119.    UL repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

120.    The above-described conduct of Defendants constitutes unlawful and unfair competition in violation of California Business & Professions Code §§ 17200 et seq. (the "UCL"), in that such acts were and are unlawful, unfair, deceptive and/or fraudulent business acts.

121.    Defendants' actions as alleged above violate the "unfair" prong of the UCL, because, on information and belief, (a) the utility of such actions is outweighed by the gravity of harm they cause to UL, and/or (b) such actions are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers and end-users including regulators, customers, and employees of the Corporate Defendants.

122.    Defendants' actions as alleged above violate the "fraudulent" prong of the UCL, because they are likely to mislead and confuse a statistically significant percentage of reasonable individuals.

123.    Defendants' actions as alleged above violate the "unlawful" prong of the UCL because those same actions also constitute violations of the state and federal statutes set forth above.

124.    As the direct and proximate result of Defendants' wrongful conduct, UL has suffered and

will continue to suffer actual injury and the loss of money, including irreparable injury to its reputation and goodwill.  Unless enjoined, Defendants' wrongful conduct will continue to cause great, immediate, and irreparable injury to UL.

125.    UL is without an adequate remedy at law.

126.    UL is therefore entitled to injunctive relief, pursuant to California Business and Professions Code § 17203.

### ALLEGATIONS OF DAMAGE COMMON TO ALL CLAIMS FOR RELIEF

127.    UL repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

128.    UL has suffered, is suffering, and will continue to suffer irreparable harm and damage as a result of Defendants' wrongful conduct.  Defendants will, unless restrained and enjoined, continue to act in the unlawful manner complained of herein, all to the irreparable damage of the business and reputation of UL.  UL's remedy at law is not adequate to compensate it for the injuries suffered and threatened.

### PRAYER FOR RELIEF

WHEREFORE, UL respectfully prays the Court:

A.    Enter a judgment in favor of UL and against Defendants, jointly and severally, on all Counts alleged herein;

B.    Designate this action an exceptional case entitling UL to an award of its reasonable attorneys' fees incurred as a result of this action, pursuant to 15 U.S.C. § 1117;

C.    Issue preliminary and permanent injunctive relief against Defendants, and each of them, and their respective officers, agents, representatives, servants, employees, attorneys, successors and assigns, and all others in active concert or participation with Defendants, enjoining and restraining them from:

(i)    imitating, copying, or making any other infringing use of the UL Service Mark

and the UL Certification Marks by the Defendants' Counterfeit Mark, and any other mark now or hereafter confusingly similar to the UL Service Mark or the UL Certification Mark;

(ii)  manufacturing, assembling, producing, distributing, offering for distribution, circulating, selling, offering for sale, advertising, importing, promoting, or displaying any simulation, reproduction, counterfeit, copy, or colorable imitation of the UL Service Mark, the UL Certification Marks, Defendants' Counterfeit Mark, or any mark confusingly similar thereto;

(iii)  using any false designation of origin or false description or statement that can or is likely to lead the trade or public or individuals erroneously to believe that any good has been provided, produced, distributed, offered for distribution, circulation, sold, offered for sale, imported, advertised, promoted, displayed, licensed, sponsored, approved, or authorized by or for UL, when such is not true in fact;

(iv)  using the names, logos, or other variations thereof of the UL Service Mark, the UL Certification Marks, or Defendants' Counterfeit Mark in any of Defendants' trade or corporate names;

(v)  engaging in any other activity constituting an infringement of the UL Service Mark, the UL Certification Marks, or of the rights of UL in, or right to use or to exploit the UL Service Marks and the UL Certification Marks; and

(vi)  assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (i) through (v) above;

D.  Order Defendants, at their own expense, and subject to review by UL, to recall all products and marketing, promotional, and advertising materials that bear or incorporate Defendants' Counterfeit Mark, or any mark confusingly similar to the UL Certification Marks or the UL Service

Mark, which have been manufactured, distributed, sold, or shipped by Defendants or on their behalf, and to reimburse all customers from which said materials are recalled.

E.     Order Defendants to immediately produce and turn over to UL's counsel, all products, labels, signs, prints, packages, molds, plates, dies, wrappers, receptacles, and advertisements in their possession or under its control, bearing the Defendants' Counterfeit Mark, and/or any simulation, reproduction, copy, or colorable imitation thereof, and all plates, molds, matrices, and any other means of making the same.

F.     Order Defendants to immediately supply UL with a complete list of entities to whom they distributed and/or sold products falsely bearing the UL Certification Mark as well as complete information regarding the sourcing and manufacture of Defendants' products bearing the Counterfeit Mark.

G.     Order expedited discovery to commence immediately.

H.     Order Defendants to publish notice to all customers or members of the trade who may have seen or heard of Defendants' use of Defendants' Counterfeit Mark, as well as to the appropriate regulatory bodies, which notice shall disclaim any connection with UL and shall advise them of the Court's injunction order and of Defendants' discontinuance from all use of Defendants' Counterfeit Mark;

I.     Order Defendants to file with this Court and to serve upon UL within thirty (30) days after service upon Defendants of an injunction in this action, a written report by Defendants, under oath, setting forth in detail the manner in which Defendants have complied with the injunction.

J.     Order Defendants to pay the costs of corrective advertising and any public, regulatory or other notices issued by UL;

K.     Order Defendants to hold in trust, as constructive trustees for the benefit of UL, their unlawful gains and profits obtained from their provision of the Defendants' goods offered for sale under Defendants' Counterfeit Mark;

L.     Order Defendants to provide UL a full and complete accounting of all amounts due and owing to UL as a result of Defendants' illegal activities;

M.     Order Defendants to pay the general, special, actual, and statutory damages of UL as follows:

> (i)     UL's damages and Defendants' unlawful gains and profits pursuant to 15 U.S.C. § 1117(a), trebled pursuant to 15 U.S.C. § 1117(b) for Defendants' willful violation of the federally registered trademarks of UL; and
>
> (ii)    If UL so elects, statutory damages of up to $2,000,000 per counterfeit mark, per type of product sold, offered for sale, or distributed, pursuant to 15 U.S.C. § 1117(c);

N.     Order Defendants to pay to UL both the costs of this action and reasonable attorneys' fees incurred by UL in prosecuting this action, pursuant to 15 U.S.C. § 1117(a).

O.     Award UL its prejudgment interest; and

P.     Award such other and further relief as the Court deems just and proper.


DATED: September 19, 2016                          GREENBERG TRAURIG, LLP

By: /s/ Matthew R. Gershman
Matthew R. Gershman
*Attorneys for Plaintiff UL LLC*


## **DEMAND FOR JURY TRIAL**

UL hereby demands a trial by jury of all triable issues raised by this Complaint.

DATED: September 19, 2016                          GREENBERG TRAURIG, LLP

By: /s/ Matthew R. Gershman
Matthew R. Gershman
*Attorneys for Plaintiff UL LLC*